| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| *In re* Houston Regional Sports Network, L.P., <br><br> Debtor. | § <br> § <br> § <br> § | Bankruptcy 13-35998-H1-11 |

| | | |
|---|---|---|
| Houston SportsNet Finance, LLC, *et al.*, <br><br> Appellants, <br><br> *versus* <br><br> Houston Regional Sports Network, *et al.*, <br><br> Appellees. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Civil Action H-14-3133 |

## Opinion on Appeal

1. *Introduction.*

   A creditor appealed its treatment under a reorganization plan. Because the bankruptcy court did not err in confirming the plan, it will be affirmed.

2. *Background.*

   Houston Regional Sports Network broadcasts Houston Astros and Rockets' games in greater Houston. The network pays the teams to broadcast the games. In turn, it sells its broadcasts to distributors for a monthly fee per subscriber.

   To televise the programs, each distributor agrees to carry the network. These carriage agreements set the rates that the distributor pays per subscriber, each month. The rate varies by zone throughout greater Houston.

   In 2010, Comcast agreed to carry the network. Additionally, it bought an interest in the network, and it lent the network $100 million. This loan was secured by a lien on all of the network's assets. After Comcast bought its interest, the network was owned by the Astros, the Rockets, and Comcast.

Before its launch in 2012, the network sought other distributors, but it was unsuccessful. No other distributor agreed to carry the network at the same rates as Comcast.

In 2013, the network was unable to pay the teams – the revenue from Comcast's carriage alone was insufficient to cover the network's overhead. Comcast petitioned under section 303 of the Bankruptcy Code for involuntary bankruptcy protection for the network.

A little over one year later, the network proposed a plan to reorganize. The bankruptcy court confirmed the plan on October 30, 2014. Under the plan, AT&T and DirecTV will own the network. Both will carry the network along with Comcast. The teams will slightly modify the terms on which the network pays them.

Comcast has appealed the bankruptcy court's treatment of its $100 million loan under the plan.

3. *Collateral.*

To secure its loan, the network granted Comcast a lien on all of its assets. This included the network's cash, accounts receivable, equipment, furniture, and fixtures. In addition to these "tangible" assets, the lien also covered the network's "intangible" assets, including Comcast's carriage agreement.

Under the confirmed plan, the network's cash, accounts receivable, furniture, fixtures, and equipment will be sold at auction. The network's "intangible" collateral – Comcast's carriage agreement – will remain with the network.

Comcast complains about the valuation of its "intangible" collateral.

4. *Code.*

Generally a secured creditor is entitled to repayment or its collateral. The collateral affords the creditor a baseline of protection against default. The bankruptcy code ensures this protection.

Under the code, however, if a creditor is undersecured – the creditor is owed more than its collateral is worth – the creditor's claim is bifurcated. One portion remains secured to the extent of the collateral's value. The other portion, above the value of the collateral, becomes an unsecured claim.[1]

---

[1] 11 U.S.C.A. § 506.

Bifurcation requires the court to value the collateral to determine the amount of the secured claim. The court must value a creditor's collateral in light of its proposed disposition.[2] Under chapter eleven, to protect a creditor from the court's undervaluing its collateral, the code allows a creditor to elect not to bifurcate its claim.[3] By not bifurcating, a creditor's only recourse is the collateral – it has no unsecured claim for the deficiency.

A creditor may not elect if its collateral is being sold or if the collateral has inconsequential value.[4]

5. *Election.*

Below, Comcast elected not to bifurcate its claim. Comcast's "tangible" collateral – cash, accounts receivable, fixtures, furniture, and equipment – is worth $26.2 million. Because its "tangible" collateral was sold or abandoned under the plan, Comcast's election rested on its "intangible" collateral – its carriage agreement.

The bankruptcy court found that on the effective date of the plan, the carriage agreement was worth $54.3 million. On the petition date, however, the bankruptcy court found that it was worth nothing. Consequently, it did not allow Comcast to elect not to bifurcate its claim.

6. *Timing.*

Comcast says that it was error to value the affiliation agreement on the petition date. It says that the bankruptcy court should have valued the collateral on the plan's effective date because the code and other cases compel it.

A. *Code.*

The code does not specify when the collateral must be valued. Comcast says that the code's penumbra implies that the plan's effective date is determinative.

---

[2] 11 U.S.C.A. § 506(a).

[3] 11 U.S.C.A. § 1111(b).

[4] 11 U.S.C.A. § 1111(b)(1)(B).

It says that because the collateral must be valued in a way that reflects the debtor's use, the collateral must be valued on the plan's effective date because the debtor's use is tied to the plan.

This proves too much. Nearly everything is tied to the plan in a chapter-eleven case. Valuing the collateral in light of its disposition informs *how* to value the collateral, not *when*. Temporal juxtaposition or a loose-causal connection is no logical reason to prefer the effective date.

Additionally, under the code, if a creditor's collateral is kept by the reorganized debtor over the creditor's objection, the creditor may retain its lien and it is entitled to receive payments with a present value as of the effective date that equal the value of its collateral. If the creditor elects under section 1111(b), then it is entitled to receive payments with a face value equal to the amount of its claim, and the present value of those payments must be at least equal the value of the collateral.[5] Comcast says that it would be odd to require that a secured creditor be paid the present value on the effective date of the plan for its collateral on the petition date.

This is not an odd result. The amount of the secured creditor's claim is determined before the amount of the deferred-cash payments that are paid on the effective date of the plan. To determine the amount of an undersecured creditor's claim, the court bifurcates. The undersecured creditor may then elect not to bifurcate, and the court would value the collateral. The collateral's value is tied to the amount of the allowed claim, which necessarily must be determined before deciding whether the plan is fair to secured creditors. Put differently, the amount of the deferred-cash payments is determined on the effective date of the plan, not the amount of the allowed claim or the value of the collateral that secures it.

B. *Stembridge*.

Because the code is ambiguous, the bankruptcy court held that precedent compelled it to value the affiliation agreement on the petition date.[6]

Comcast says that the bankruptcy court's reliance on *Stembridge* was inappropriate because (a) it is not controlling in a chapter-eleven case, (b) changes to the code after the

---

[5] 11 U.S.C.A. § 1129(b)(2)(A)(i)(II).

[6] In re Stembridge, 394 F.3d 383 (5th Cir. 2004).

decision obviate its result, and (c) its reasoning does not compel the instant result.

Though decided under a different chapter, *Stembridge's* reasoning is applicable and compelling. Additionally, though intervening changes to the code may alter its result, it has not been specifically overruled.

Comcast says that *Stembridge* ensured that secured creditors were protected from asset depreciation – a rationale that it says cuts against valuing Comcast's collateral on the petition date because it would deprive Comcast of the collateral's appreciation. *Stembridge* does not stand for the proposition that the court should use whatever date most benefits the creditor.

The code does not compel the neat symmetry that Comcast suggests. The code entitles a secured creditor to – at least – the present value of its claim at the institution of the automatic stay – it is protected against depreciation, as *Stembridge* made clear. Conversely, valuing an undersecured creditor's collateral on the petition date works no forfeiture. The value of its claim is not altered by the appreciation. The only effect, if any, is how it is paid.[7]

The bankruptcy court did not err by valuing Comcast's affiliation agreement on the petition date.

7. *Value.*

To value Comcast's affiliation agreement, the bankruptcy court discounted to present value the network's projected net income through 2032 and apportioned it among the network's assets according to the percentage of income that each asset would generate each year. This "discounted-cash-flow" methodology was urged by appraisers from both Comcast and the plan's proponents.

Applying this method, the bankruptcy court found that Comcast's affiliation agreement was worth $54.3 million on the confirmation date. On the petition date, applying the same method, the bankruptcy court found that the agreement was worth nothing. The difference came from the court's accounting for costs incurred by the network between the petition date and the effective date of the plan – the administration and priority expenses. The bankruptcy court treated these expenses as part of the network's overhead for the year between the petition date and the effective date. It then included that year's net income in the sum of the network's

---

[7] 11 U.S.C.A. § 1129 (b)(2)(B).

projected-net income, and it apportioned that year's net income to Comcast's affiliation agreement.

Comcast says that the network has not and will not incur these expenses. Because the network will not pay these costs, Comcast says that logically it cannot affect the network's value. This is true, so far as it goes. Under the plan, the teams waive their claims to these priority payments. Comcast's contention, however, assumes that its collateral is valued on the confirmation date. This waiver does not obviate the fact that it is an incurred cost – a liability of the network. On the confirmation date, the network owed the teams. That debt was treated through the confirmed plan.

Comcast says that assuming these expenses were losses incurred by the network, it was error to allocate them exclusively to Comcast's collateral. Rather, it says that the bankruptcy court should have deducted these expenses from the network's value – shared *pro rata*.

The bankruptcy court followed the model proffered by Comcast's own appraiser. Under the model, the network's value is the sum of discounted, yearly net income over the life of Comcast's affiliation agreement. Each year, the network generates money from distributing its broadcasts. From this gross revenue, it deducts its overhead – costs. The difference yields the network's net income for the year. The sum of each year's discounted-net income yields the network's present value. The annual-net income is apportioned among the network's distributors to determine the value of each's carriage agreement for the year. The sum of each year's discounted, apportioned value yields the present value of each agreement.

To value Comcast's affiliation agreement on the petition date, the bankruptcy court simply applied the appraiser's model. Comcast's was the only extant affiliation agreement from the petition date through the confirmation of the plan. Over this, roughly, one-year period, the network operated at a loss – its costs exceeded its revenues. The bankruptcy court apportioned the net income to the affiliation agreement for the year, as dictated by the model.

Comcast says that the effect of the bankruptcy court's allocation of the expenses to its collateral was to flip the code's priority – subordinating Comcast's secured claim to the team's unsecured claim for unpaid-media rights – the money the network owes the teams for the right to broadcast the games.

Valuing collateral to decide the extent of a creditor's security does not subordinate its claim. Any causal affect is incidental. Comcast's claim is fully secured to the extent of its "tangible" collateral's value. Beyond the value of the "tangible" collateral, the teams fare no

better than Comcast. Both are unsecured creditors. The claims are not subordinated.

As a matter of common sense, the bankruptcy court reasoned that the value of Comcast's collateral must account for the costs incurred to realize its value. Put differently, without the reorganization, Comcast's collateral would be worthless. Unless the court accounted for the cost of the reorganization, the collateral's appreciation would be a windfall to Comcast.

The bankruptcy court's conclusion that Comcast's affiliation agreement, valued on the petition date, was worthless was not erroneous.

8. *Conclusion.*

The bankruptcy court did not err by valuing Comcast's collateral on the petition date. It did not erroneously value the affiliation agreement. It will be affirmed.

Signed on August 20, 2015, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge